This is Thompson. Good morning. May it please the Court, my name is Anthony Yang and I'm appearing on behalf of the Secretary of Health and Human Services. With the Court's permission, I'd like to reserve five minutes of my time for rebuttal. This Medicare case involves the Secretary's interpretation of his new provider regulation found at 42 CFR Section 413.30. If a provider qualifies as a new provider under this regulation, the regulation gives the Secretary the discretion to supersede a determination that has been made by Congress that non-capital routine service costs in excess of the cost limits are unreasonable and should not be reimbursed by the federal government. Because this regulation has the effect of displacing this congressional determination, the Secretary has construed his regulation narrowly to avoid improperly circumventing the judgment of Congress that costs exceeding the cost limits are unreasonable and thus unreimbursable. Under the Secretary's interpretation, Providence's distinct part skilled nursing facility, or in Medicare parlance it's an SNF or SNIF, does not qualify as a new provider and is not eligible for an exemption from the cost limits. The portion of the definition of new provider that's pertinent to this appeal requires the Secretary to consider if a provider of previously, when a, the Secretary's interpreted this to mean that when a skilled nursing facility operates its beds only by virtue of its acquisition of the right to operate the same beds from another entity that previously operated the beds, the facility continues to operate these beds and is deemed to have operated under previous ownership. The question of ambiguity first requires the court to address whether the regulation specifically addresses the what it means for a provider to operate under previous ownership. Certainly there's nothing in the regulation itself that addresses that. And if you look further back to the statutory definitions applicable under the Medicare statute, you'll find that a provider is defined to be a number of separate things, and with respect to this case, a skilled nursing facility. But a skilled nursing facility is defined to be an institution or a distinct part of an institution that renders skilled nursing care. And the, what the district court missed in this case, although it did parrot the Ashtabula District Court's opinion regarding a distinct part, is there is no clear and unambiguous meaning for what it means for a distinct part of an institution or a distinct part provider to have operated under previous ownership. So your argument is that it's ambiguous, we defer. That's right, Your Honor. And if we get to the question of the basis of your whole argument. That is, that is correct, Your Honor. And ambiguity is in the word provider and or previous ownership, which of these? It's actually the conjunction of the two, Your Honor, because a provider might be sufficiently defined for purposes of saying certifying that you meet requirements necessary under Medicare to, in terms of staffing or something like that. But when we're talking about the previous ownership inquiry, the regulation in the statute's definition of what a provider is simply doesn't answer the question of what it means to operate under previous ownership. And once we get to the question of ambiguity, the two circuits that have addressed this question uniformly found that the Secretary's policy rationales are legitimate. And secondly, the Maryland General Decision out of the four circuits hits its head, albeit in dicta, indicating that the policy rationales might well be reasonable in the context of the skilled nursing industry. And given that there are no new beds added to the system, when you simply shift beds from one entity to another. Does that mean that in a state with a certificate of need moratorium, that these exemptions could never be invoked then? Not always. Most of the time, that's true, Your Honor. If the facility has taken out of circulation its beds for a sufficient number of years, then it could be a new provider when it adds them back in. Additionally, you can get an exemption, even though you might not qualify as a new provider, you can get what's an equivalent exemption by relocating. And if you're a relocated provider, you would move from one area to the next. And if you can show that it results in you serving a substantially different... So arguably, you have a whole different geographic... And you're serving a different population, and you have to also show that there's a substantial reduction in inpatient days. And for the same size facility, that means you're underutilized. And that brings us back to what the whole purpose of this exemption is, which is to address the method by which the cost limits are calculated. Cost limits are calculated on a national basis by looking at SNFs nationwide and determining what the average routine service costs are, non-capital routine service costs. Capital costs such as construction are excluded, and those are reimbursed separately. They're not You take the average, you increase it to 112% of the average to give some buffer to any particular SNF. You adjust it for the wage rates in the area. And then for a hospital-based SNF, like we have in this case, it's even higher. And what happens when there's initial underutilization is that when you're figuring out the per diem cost, which is the method by which you calculate the routine service cost limits, they're all based on per diems. If you're only at 50% average capacity, you have a lot of fixed cost staffing and other costs which are fixed. And to calculate the per diem rate, if you're dividing by half the number of days, you would have twice the costs. And so what this regulation does is addresses the problem of initial underutilization. After the three years, if you're underutilized for your own problem, we're not going to compensate that. That's right. I mean, certainly the guiding star of Medicare reimbursement is reasonable reimbursement. I just want to ask this question on the facts here. Is it true the Secretary initially treated New Providence as a new provider? No, Your Honor. It is not. From the very beginning, it was treated as not as a new provider. Medicare, unfortunately, as the Supreme Court has recognized, is a highly technical and complicated regime where you have terms which often mean different things in different contexts. Like chow. Exactly. I mean, this is what I think Paragon and South Shore, the courts, acknowledge. It's a very complicated context. We're talking about a chow here in the context of assigning a provider agreement from one legal entity to the next. And in that context, a change in ownership or chow has a different meaning than it does here. If you look at Section 1500.7, which is what the Secretary has used to give meaning to the new provider regulation, in the preamble to Section 1500, the regulation specifically says that the described events below are not intended to define changes of ownership for purposes of determining historical cost of assets or the continuation of the provider agreement. This is a different context. The reason why they had to have a new provider agreement is the summit view does exist. I mean, it continues to exist in a reduced form, essentially selling off 40 beds, of which 12 of which were ultimately used as Providence's SNF. And so, anytime you're going to have a new facility under new ownership, you're going to require some certification and a new agreement, because there already exists agreement with summit view. Let me ask one other question. How does HHS reconcile the limited chow grounds in 42 CFR 489.18 with the more expansive grounds in PRM and all these numbers? It's a different definition of chow. Well, I think one probably subsumes the other. It's one of those Venn diagrams, which one is probably completely within the other. 1500, I believe, and I'd have to look at it again, but I believe it restates all of the provisions of 489.18. That provision deals only with the question of when a change in ownership results in the assignment of the provider agreement from one entity that's sold to another. So, if you take over the entire business entity, the agreement is deemed to swing over. But in the context of the change in ownership, saying that in 483.18, excuse me, 49.18, 1500 is not coterminous with 49.18. It's not intended to mean the same thing. And this is a problem that many laypersons might have coming to the Medicare system. It's one where you have terms which sound the same in different contexts that mean very different things. And I think both the Seventh Circuit and the First Circuit recognize this in their opinions. What we have contrary, of course, is the Maryland general decision in the Fourth Circuit, where unfortunately the court was not briefed on the question of ambiguity. There was a unique situation in Maryland where when a provider is given a right to operate, they're given 12 additional beds that kind of fit an ether that they can expand into. These are called waiver beds. And Maryland general argued that what they got was waiver beds, not operational beds like we would have transferred here, and that they conceded the secretary's interpretation was permissible for operational beds, but then said, but this is a waiver bed context. Consequently, we never briefed the question of textual ambiguity because they conceded the applicability of a regulation as a general question. It was simply a policy-based argument as to whether you should extend the definition from simply operational beds to this rather unique state law situation in Maryland of waiver beds. The Fourth Circuit, if you look at footnote two of the majority opinion and the text around footnote one of the dissent, you'll see that the question really wasn't addressed, and they, I think, admit so in their opinion, but nevertheless decided because they found that they had to determine whether the opinion presumes that the provider is the hospital, and it doesn't address the definition of a skilled nursing facility, which squarely rejects that interpretation because a skilled nursing facility can be simply a distinct part of a larger institution, which, as we explained in our brief, can simply mean kind of a set of intangible assets that are used by the larger institution to provide a specific type of care. And when we're looking at what it means to operate it under previous ownership, there's no clear line in that context that you can say the plain text says you draw the line here. It's certainly not a physical entity because you can have a relocated provider, and it's certainly not every single asset that is used to provide skilled nursing care because assets change daily. They're used. So there has to be some line that the secretary draws to give content to the new provider regulation in light of the fact that a provider can be simply this intangible, intangible, distinct part of a larger entity, and that line is section 1500.7. Once we get to the point of drawing lines, that drawing of a line lies squarely within the province of the agency, and as the Supreme Court recognized in Thomas Jefferson and Complicated Scheme where drawing of lines largely turns on the use of agency expertise and experience in managing the Medicare system. And in that context, they're given a high degree of deference, greater than even Chevron deference, in fact, Seminole Rock deference. So if we look then to the question of whether or not the secretary's construction of ambiguity is a permissible one, the question is whether or not it's plainly inconsistent with the regulation or indications of the secretary's intent at the time that regulation was promulgated. The intent behind the regulations we briefly discussed is to address this problem of underutilization and the means and how that affects the fairness of applying these cost limits, which are calculated kind of on a nationwide basis when you've got someone who may be underutilized at the start. And what you find here is in this case, there is a moratorium. We call it a moratorium. The state doesn't call it a moratorium, but in effect, it's a moratorium. No beds can be added to a specific county until or unless you take beds from one place, as we did here two miles down the road, take 40 beds and reduce it to a 12-bed facility. In fact, I'm not sure what happened to the other beds. The record doesn't reflect that, but at best, the number of beds in the county stayed consistent. It may have in fact reduced as a result of the change in ownership of the bed rights. And in that context where there is a cap on the total number of beds in a county, it provides, like many government regulations, an economic distortion in the market that assists providers with the problem of initial underutilization. And in fact, if you look in this case, the utilization rates for the provider range from 84% in its first year to 92% to 89%. This is not an underutilized provider. This is a provider that has had a huge advantage in not having any competition for new beds because the total number of beds is capped. Now, there's been some discussion in the Ashtabula District Court decision, which I should note to the Court, was argued in the Sixth Circuit three weeks ago, that the Ashtabula District Court found that, well, there could be multiple numbers of facilities. It shows there could be competition. But that reasoning confuses the concepts of supplier and supply and economics. If you've got an X number of beds, it doesn't matter whether you've got one facility, a bed. You've only got X number of beds, and those beds have to satisfy the demand for nursing facility beds in the county. So the very purpose of the very existence of the moratorium undermines the very purpose of the Ashtabula District Court of providing this exemption for underutilization. Similarly, the moratorium simply shifts around beds from two miles down the road to Ashtabula's third floor unit in its hospital, and in doing so, simply shifts these beds from one place to another. The Secretary has determined that it would not be appropriate in the spirit of reasonable cost reimbursement, which excludes costs which are unnecessary in the efficient delivery of needed health services, it would be inefficient to reimburse with exceptionally high, here we're talking 230 to 267 percent what the cost limits are for this hospital. And the cost limits themselves are set 12 percent higher than average, and therefore hospitals are even set higher than that. It would be inefficient to do that when they're simply shifting these beds back and forth in the same county. Similarly, the third reason, besides underutilization and shifting beds, the state moratorium on this kind of basis is a state determination that there are no more needed beds. So it's not efficient in the delivery of needed health services to compensate at a higher rate for beds which the states already determined are not needed. Every single court of appeals that's addressed this, the two, the Seventh Circuit and the First Circuit, have found these reasons to be wholly consistent with the purpose behind the regulation, and therefore have affirmed the Secretary's interpretation. As I said before, the Fourth Circuit has suggested that it might find that way, but found itself bound by, I believe, an incomplete understanding of the regulatory scheme. The last point that we make in our brief is that there are no costs here that are being unfairly compensated. The cost limits themselves only apply to non-capital costs. So the costs that were incurred of roughly, I believe it was $821,000 to renovate this third floor are going to be compensated by the appropriate amount outside the cost limits. So capital costs aren't an issue. All we're talking about is non-capital routine service costs. The question about the per diem cost, sometimes within a range of SNFs, one SNF might provide a higher degree of care. That's undisputed. Providence, I'm sorry, provides a higher degree of care than what's accounted for in the cost limits themselves. But what they get for that is an exception from the cost limits that raise the cost limits to take account of their atypical services. And that was done in this case. And finally, if they really had served a substantially different patient population and had relocated, they could get an exemption as a relocated provider. But taken into the totality of this system where the secretary has accounted for the means of calculating the limits, the various situations where a provider might not be fairly compensated under these limits, the secretary has kind of covered all the bases. And it would be not only incorrect as a matter of policy, it would be appropriate to compensate costs that are 260 percent the cost limits in this case, because the provider has not added anything to the system in terms of new beds. If the Court has any questions, otherwise I'll come back for rebuttal.  Your Honors, my name is Stephen Pence, and I'm here representing Providence Health System. Listening to Mr. Yang's argument, I have to admit I'm somewhat amused. Having worked on this case since 1996, when Providence Yakima first requested a new provider exemption, I find it interesting to hear the secretary's attorney state that the secretary wants to do is to draw a line. Well, from my experience, I've been following a moving line for nearly seven years now. We started out with a situation where the secretary denied the request for a new provider exemption because he considered it, or she at that time, to be a relocation. And because it was a relocation of allegedly Summit View Manor, the attorney was not serving a different patient population. When was it first requested? When was the exemption first requested? It was requested in 1996, Your Honor. And when did the move take place? The move actually took place in 1993. Is there anything in the record that shows why it waited three years to request this? Oh, Your Honor, the reason for that is it's a procedural matter under the Medicare system, because the rule states that you may request it within 180 days after the end of the applicable cost reporting period. And although the facility was opened in May of 1993, the first cost reporting periods were not subject to filing until a later date. So there was no waiting here. They filed it as soon as they were able to. In fact, not all the cost reports for these years were finalized before they submitted their request for an exemption. They weren't finalized until 1996? For the first year. As you recall, the new provider exemption applies to three complete years and then a partial year. So it applied in 1993, 1994, 1995, and 1996, part of 1993. So under the procedure rules for filing these, we filed within the correct period of time. The issue, Your Honor, is at the time that we created this facility, as Mr. Yang concedes, and as you noted in your question to Mr. Yang, the secretary treated this as the establishment of a new provider. The record shows, and we provided it in our supplemental excerpts of record, that the department issued a quote-unquote new provider agreement to Providence Yakima for its skilled nursing facility, or SNF, which is one of the acronyms we use in this business. In what year? That was in 1993. It was in 1993? Yes. So we were certified as a new provider, surveyed, certified, issued a new provider agreement by the secretary in 1993. Procedurally, we did not have to request the exemption until a later time, but there was no doubt from the secretary's point of view that we were a new provider in 1993. And when I refer to the shifting line here, when this case was started, the ambiguity was supposedly with the term provider. And it's not just this case, Your Honor. As you know, there's a number of cases around the country, both at the district court level, the circuit court of appeals level, as well as the PRB level. Let me ask you what significance all this has, because I saw that then HICPA issued something that Providence wasn't a new provider, and then ultimately you have a hearing and you have a decision that's being appealed from that we're looking at. So let's just say there's a tortured path that got us there, that you're describing quite accurately. Right. How does that affect our legal judgment as to whether this regulation is ambiguous? Well, I do want to focus on the ambiguity, Your Honor. And as you might expect, I'm a fan of the Astabilla decision and of the Maryland general opinion. And I guess I share the Astabilla... ...and I understand what the circuits that have considered the issue. My question is, does it matter that you might have had some conflicting certificates or pieces of paper prior to the final decision in our interpretation of this regulation as ambiguous or not ambiguous? No, Your Honor. I was just responding to Judge Nelson's question about the sequence for the certification. I'm just trying to understand if it has any legal significance. You're talking about the shifting line. Well, the argument is that we feel that the word provider is unambiguous. And as we pointed out, if you're looking for a contemporaneous interpretation of provider at the time the regulation was adopted, in the Medicare statute, a provider is defined as various types of facilities.  The term skilled nursing facility is defined in the Medicare statute, which was in effect at the time this regulation was adopted, as an institution. And in the PRM itself, the Provider Reimbursement Review Manual, another of these acronyms that we work with, the Provider Reimbursement Manual provision 2604, which, by the way, is the one that applies to this case, not the subsequently adopted 2533, states that a provider, a new provider, is an institution. To us, the plain meaning of the word provider is an institution, which connotes a physical facility. That's the plain English meaning of that word, Your Honors. What about an institution or a service within an institution? It's also a provider, is it not? Again, this is a shifting line that we're dealing with. This whole distinct part spin on this is the latest iteration of an attempt to find some sort of ambiguity in statutory and regulatory language, which is, to us, very plain. Provider, institution, distinct part of institution. A distinct part unit, Your Honor, is a physically distinct part within a hospital. This is a distinct part skilled nursing facility within the hospital, but it, as I pointed out previously, it...
judges: D Nelson, Kozinski, McKeown